## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA
## CHARLESTON DIVISION

| | | |
|---|---|---|
| UNITED PROPERTY & CASUALTY INSURANCE, | ) ) ) | |
| Plaintiff, | ) ) | No. 2:19-cv-01856-DCN |
| vs. | ) ) | **ORDER** |
| ALLEN P. COUTURE, | ) ) | |
| Defendant. | ) ) | |
| _____ | ) | |

This matter is before the court on plaintiff United Property & Casualty Insurance's ("UPC") motion for summary judgment, ECF No. 90, and defendant Allen P. Couture's ("Couture") motion for partial summary judgment, ECF No. 91. For the reasons set forth below, the court denies Couture's motion for partial summary judgment and grants in part and denies in part UPC's motion for summary judgment.

## I.  BACKGROUND

This insurance dispute arises out of a homeowner's insurance policy (the "Policy") between an insurer, UPC, and its former insured, Couture, covering Couture's primary residence located at 1344 Winterberry Avenue, Goose Creek, South Carolina (the "Residence"). Prior to purchasing the Residence, Couture had an inspection performed on August 29, 2019 that unearthed several issues, including damage to the subflooring in multiple locations and faulty shut-off valves that caused the plumbing underneath the laundry room and kitchen to leak (the "First Inspection Report"). ECF No. 90-1. After the seller of the Residence (the "Seller") purported to fix those issues, Couture had a second inspection performed on September 21, 2018. The second

1

inspection found all repairs to the "Plumbing System," including to the shut-off valves, to be "satisfactory"; however, it also noted that certain repairs to the subflooring in the master bathroom and kitchen "d[id] NOT appear to be adequate" because the subflooring remained "deteriorated" (the "Second Inspection Report," also referred to as the "reinspection report"). ECF No. 90-4 (emphasis in original). The Seller subsequently agreed to hire a contractor to make all the outstanding repairs. ECF No. 91-2, Couture Aff. ¶¶ 10–11. The contractor completed these repairs, and on October 3, 2018, wrote a letter to the Seller summarizing the repairs that were done. On October 5, 2018, Couture filed an application for a homeowner's insurance policy with UPC. ECF No. 90-7. The application included a question asking if the Residence had any "unrepaired or existing damage," to which Couture responded, "No." Id. at 4. UPC granted the application and issued the Policy to Couture with the policy period beginning on October 15, 2018 and continuing through October 15, 2019. ECF No. 90-8.

According to the complaint, on March 17, 2019, Couture became aware of a leak in the laundry room's water supply line that caused significant water damage to the subflooring and walls of the laundry room and caused the kitchen cabinets to become "warped." ECF No. 91-1 at 2. As a result, Couture filed a claim under the Policy. On March 22, 2019, UPC sent Michael Howell ("Howell")—a third-party field adjuster at the independent adjusting firm Worley Claims Services, now known as Alacrity Claims—to perform a field inspection of the Residence. After receiving the inspection report from Howell, UPC denied Couture's claim by letter dated April 4, 2019, reasoning that the claimed damages "appear as a result of long-term water and mold damage prior to your policy inception date, and are considered pre-existing damages prior to the policy

term." ECF No. 90-11 at 2. On April 9, 2019, UPC sent Couture a second letter cancelling the Policy due to a material misrepresentation of fact, based on Couture's answer on the Policy application that the Residence was free of "unrepaired or existing damage." ECF No. 90-13 at 3. On May 2, 2019, UPC sent Couture a third letter confirming its declination of the claim. ECF No. 90-15.

On June 28, 2019, UPC filed this declaratory judgment action, asking the court to declare that Couture is not entitled to coverage under the Policy for claimed damages to the Residence. ECF No. 1, Compl. On August 8, 2019, Couture answered the complaint and asserted counterclaims for breach of contract, bad faith, and negligence. ECF No. 5.

On November 12, 2021, UPC filed its motion for summary judgment. ECF No. 90. Couture responded to the motion on November 29, 2021, ECF No. 92, and UPC replied on December 6, 2021, ECF No. 94. On November 15, 2021, Couture filed his motion for partial summary judgment. ECF No. 91. UPC responded on November 29, 2021, ECF No. 93, and Couture replied on December 6, 2021, ECF No. 95. The court held a hearing on the motions on February 7, 2022. ECF No. 100. As such, both motions have been fully briefed and are now ripe for review.

## II.  STANDARD

Summary judgment shall be granted if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine

issue of material fact." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247–48 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." <u>Id.</u> at 248. "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Id.</u> "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." <u>Id.</u> at 249. The court should view the evidence in the light most favorable to the non-moving party and draw all inferences in its favor. <u>Id.</u> at 255.

### III.  DISCUSSION

UPC and Couture submit competing motions for summary judgment. UPC's motion seeks summary judgment on both its requested coverage declaration and on Couture's counterclaims. Couture's motion seeks summary judgment only on UPC's requested coverage declaration. Because Couture's counterclaims are dependent on the existence of a valid policy, the court first addresses whether summary judgment is warranted in either party's favor on the coverage declaration before moving on to the merits of Couture's counterclaims.

#### A.  Declaratory Judgment

Both parties request that the court grant summary judgment in their favor on UPC's declaratory judgment claim. The court finds that neither UPC nor Couture are entitled to summary judgment, as neither side has shown whether the insurance coverage should be recognized or not as a matter of law. The court addresses each of the main arguments underlying the motions below.

### 1. "Loss Which Occurs During the Policy Period"

To determine whether the Policy provides coverage for the losses incurred by Couture as a result of the leak, the court must first decide whether a loss occurred "during the policy period." Subsection P of the Policy's "Conditions" section states that "th[e] Policy applies only to loss which occurs during the policy period.'" ECF No. 90-8 at 18. Moreover, both UPC and Couture agree that the Policy covers "occurrences," and the term "occurrence" is defined in the Policy as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions, which results, during the policy period, in: a. "Bodily injury"; or b. "Property damage." ECF No. 90-8 at 5 (emphasis added). Because the Policy only covers losses that occur during the policy period, Couture agreed during his deposition that "if the leak had been there prior to [his] ownership of the home . . . it would not be covered." ECF No. 90-1, Couture Dep. at 115:12–18. However, the parties dispute whether Couture's property damage is covered under this section.

"An insurance policy is a contract between the insured and the insurance company, and the terms of the policy are to be construed according to contract law." Auto Owners Ins. Co. v. Rollison, 663 S.E.2d 484, 487 (2008). "The cardinal rule of contract interpretation is to ascertain and give legal effect to the parties' intentions as determined by the contract language." Beaufort Cnty. Sch. Dist. v. United Nat'l Ins. Co., 709 S.E.2d 85, 90 (S.C. Ct. App. 2011) (citing Schulmeyer v. State Farm Fire & Cas. Co., 579 S.E.2d 132, 134 (2003)). "If the contract's language is clear and unambiguous, the language alone, understood in its plain, ordinary, and popular sense, determines the contract's force and effect." Id. (citing Schulmeyer, 579 S.E.2d at 134). However, an

insurance contract which is "in any respect ambiguous or capable of two meanings" must be construed strictly against its drafter, the insurer. Reynolds v. Wabash Life Ins. Co., 161 S.E.2d 168, 169 (1968).

UPC argues that the property damage suffered by Couture occurred prior to the start of the policy period. In support, UPC cites to an excerpt from Couture's deposition testimony wherein Couture purportedly testified that his claimed damages matched the preexisting damages:

> Q.    You would agree that the leak that was ultimately found and replaced by All American Plumbing is in the same area as the one that was indicated in the first inspection report.
> MR. HAWK: Object to the form.
> THE WITNESS: Well, yeah, because it's in that same area. It wasn't, it didn't seem to be -- the knobs have changed so they replaced everything, so.
> BY MS. LaFAVE:
> Q.    And the damage in the crawl space, the black subflooring and insulation that you photographed is the same, kind of some of the same photographs as Mr. Howell?
> A.    As UPC's, yeah. Yeah, it looks like to be the same, yes.
> Q.    And I can show you, if you'll look at page 418 there.
> A.    418?
> Q.    Yes. We'll compare 418 on Exhibit 14 with 237 on Exhibit No. 3, your photographs. These two, these two photographs are of the same area.
> A.    Same location, correct.

ECF No. 90-1, Couture Dep. at 105:16–106:13. Based on this testimony, it appears Couture agreed the leak in the laundry room discovered by Couture in March 2019 and photographed by Howell was in the same vicinity as the leak identified in the First Inspection Report. However, in the same deposition exchange, Couture points out that the "knobs" were "replaced," referring to the fact that after the repair, the original red and blue flag valves for the washer supply line had been replaced with two red flag valves. See also ECF No. 91-1 at 3. A reasonable juror could consider this as evidence that Couture was describing a repair and, therefore, a lack of preexisting damage.

More compellingly, Couture provides evidence in support of his argument that while the property damage at issue in this case includes the damage resulting from a leak of the washer supply line valve in the laundry room, the preexisting damages that were disclosed in the inspection reports were only "in other areas of the Residence -- but there was no finding of subfloor damage under the laundry room." ECF No. 92 at 3. Couture points to the following excerpt from Couture's deposition:

> Q.     It's okay.  Based on this preinspection, or this inspection report from early August of 2018, you knew that there was deteriorated subflooring in your house?
> A.     In a separate location, yes.
> Q.     Okay.  The photographs here in Exhibit No. 3, where you took those you've showed me was laundry room and kitchen.
> A.     Correct.
> Q.     Where are the photographs on page 22 of 51 in the house?
> A.     I can't be 100 percent sure because it would be underneath the house and I don't know where he was, but from the piping, I mean that's a drain pipe, so that would be, that could be the bathroom or underneath the main sink.
> Q.     The main sink?
> A.     I'm sorry, the kitchen sink, my apologies.

Couture Dep. at 47:12–48:5.  Here, Couture appears to state that he does not believe there was preexisting damage prior to the water loss in this case and that the preexisting damage was in another area of the home.  This testimony appears to support Couture's contention that the damage identified in the First Inspection Report was not the same as the damage at issue in this case.  Still, the court finds that the conflicting information presents a genuine dispute of material fact such that neither party has met the summary judgment threshold.

To be sure, the court could find that the property damage occurred outside of the duration of the Policy period even if Couture did not admit that point during the deposition.  Under the plain terms of the Policy, if a loss occurred outside the duration of

7

the policy period, that loss that occurred outside the duration would not be covered by UPC. UPC presents two main arguments for why the evidence is sufficient to show that the claimed losses preexisted the Policy. However, the court rejects both arguments and declines to find as a matter of law that the evidence indicates the damages at issue preceded the Policy period.

First, UPC argues that the First Inspection Report and Second Inspection Report reveal the existence of damages that were never repaired. By way of background, the First Inspection Report stated, "(9) The shut off valve leaks when turn off at the laundry room. A qualified plumber should inspect and repair as needed." ECF No. 90-2 at 49. The Second Inspection Report, referring to the First Inspection Report, stated, "Re-inspected 9/22/2018[.] The repairs appear to be satisfactory. Our company does not guarantee repairs from contractors. We only re-inspect to determine whether or not repairs were performed." ECF No. 90-4 at 15. This indicated that repairs were performed on the shut-off valve in the laundry room. Addressing the First Inspection Report's finding that "[s]ub-flooring is deteriorated under the master bath and the kitchen," the Second Inspection Report further noted that "The repairs do NOT appear to be adequate. Subflooring was not replaced and is still deteriorated." ECF No. 90-4 at 12.

UPC's argument appears to blur together the types of damages identified in the inspection reports. There appear to be two different repairs discussed in the reports: one is to the shut-off valve that was leaking in the laundry room and the other is to the subflooring under the master bath and kitchen. UPC suggests that the shut-off valve and subflooring issues were related—and perhaps a jury will ultimately agree—but it appears that at minimum, they necessitated different repairs.

UPC's argument also affords little consideration to Couture's claim that following the second inspection, the Seller hired a contractor to address the outstanding repairs needed.  See Couture Aff. ¶ 10.  UPC takes great umbrage with this supposed repair job.  The Seller purportedly hired a contractor, Terry Weese ("Weese"), from a plumbing company called My Friend The Plumber.  On October 3, 2018, Weese wrote a "CL-100 letter" to the Seller indicating that he had "removed and repaired all fungi damaged subfloor that was caused by the plumbing leak," "removed the damaged wood and replaced [it]," had a third-party company "install a moisture barrier," and "treated all surfaces of the crawlspace" with a hospital-grade disinfecting fungicide.  ECF No. 90-5.  UPC claims that the CL-100 letter is "suspicious," ECF No. 90 at 26, observing that Weese was a plumber, and thereby suggesting the letter is inauthentic because a plumber would not have completed such "specialized repairs," id. at 6.  UPC also notes that the letter was "written without letter head or signature," contained several spelling errors, and that the original flooring remained in the house after Weese's handiwork.  Id. at 5.  At the hearing, UPC also noted that it had made several attempts to track down My Friend the Plumber through various channels, all to no avail.  Finally, UPC argues that even if the CL-100 letter were authentic, it disputes that Couture ever received it prior to filing the application for the Policy, noting that to date, Couture has still been unable to provide the email where he received the CL-100 letter in discovery.

The court finds that these grievances cannot be resolved at this stage and are better left for the jury to weigh.[1]  While the court is permitted to evaluate questions of

---

[1] As just one example of a question that the jury may be asked to evaluate, Couture states that he never testified he received the letter, only that an agent communicated it to him.

authenticity raised in a motion for summary judgment, such rules generally pertain to a document's admissibility. See Iraheta v. Lam Yuen, LLC, 2013 WL 6713219, at *3 (D. Md. Dec. 18, 2013) (describing requirement that documents considered on summary judgment must be authenticated). UPC has provided no reason that the letter is not authentic for evidentiary purposes—i.e., that it is not a true and correct copy of the letter that Weese purportedly sent. The corresponding weight that should be placed in the CL-100 based on UPC's concerns is an issue of credibility; as such, the court cannot reconcile the issue at this stage.

Second, UPC argues that the damages were so extensive that they could only have developed from a leak that occurred prior to the start of the Policy. UPC argues that its claims adjuster, Vladimir Chery, testified that "the damage reflected in the pre-inspection reports and reflected in Howell's inspection on the claim w[ere] the same" with regard to molding "adjacent to the laundry room where the leaks were present." ECF No. 90 at 16 (citing ECF No. 90-9, Chery Dep. at 34:6–16). Chery concluded that the water heater between the warped cabinet and laundry hose bib "indicated long term exposure to moisture," suggesting the damage therein could not have been the result of simply a few months. Id. at 17 (citing Chery Dep. at 193:17). This evidence, however, is not conclusive. As Couture notes, Chery never visited the Residence. While a juror could certainly believe that the photos produced by Howell and relied upon by Chery are evidence of long-term damage, the court cannot reach that determination as a matter of law, particularly in light of the Couture's evidence suggesting that the proper repairs had been completed. Moreover, although UPC argues that it is entirely improbable that there was both preexisting damage to the laundry room shut-off valves and kitchen subflooring

10

that were fixed <u>and</u> new damage to the washer room supply line valve that resulted in "warped" kitchen cabinets, the court's function is not to weigh the evidence and determine the truth of the matter at this stage.  As a result, the court declines to grant summary judgment in favor of UPC.

Similarly, the court denies summary judgment in favor of Couture.  Stemming from Couture's contention that the faulty appliances identified in the inspections were repaired, Couture argues that the claimed damages were thus the result of a "leak of the <u>new</u> washer supply line valve."  ECF No. 91-1 at 13.  However, UPC has presented a genuine dispute of material fact such that the court cannot determine as a matter of law that the claimed damages were the result of a completely new leak either.  Accordingly, the court denies summary judgment against both parties as to whether the Policy provision requiring a "loss which occurs during the Policy period" was or was not satisfied.

### 2.  "Unknown to All 'Insureds'"

The Policy further provides that UPC would not cover loss for

> constant or repeated seepage or leakage of water or the presence of condensation of humidity, moisture or vapor, over a period of weeks, months or years unless such seepage or leakage of water . . . . is unknown to all 'insureds' and is hidden . . . beneath the floors.

ECF No. 90 at 23; ECF No. 90-8 at 29.  The provision is contained in "Endorsement HO 04 27 04 02," which replaced subsection A.2.c.(5) in the Policy concerning "[m]old, fungus or wet rot."  ECF No. 90-8 at 29.  UPC argues that even if the provision regarding losses that occurred "during the policy" does not apply, it would still be entitled to summary judgment under this provision because both Couture and his wife possessed knowledge of the seepage or leakage of water in their home.

11

This issue, too, is subject to genuine disputes of material facts such that summary judgment is not warranted in favor of either party. On one hand, UPC argues that the First Inspection Report provided notice to Couture of (1) signs of fungi growth on the floor system in the crawlspace, (2) active moisture in the subflooring under the master bath and kitchen, (3) a leaky shut-off valve in the laundry room, and (4) a missing vapor barrier on the crawlspace ground. ECF No. 90 at 24. UPC further notes that the Second Inspection Report followed these initial reports by updating each item respectively: (1) "Fungi is still present, but may have been treated," (2) the subflooring was not replaced and is still deteriorated, (3) the repair of the shut-off valve was only "satisfactory," and (4) the repair to the vapor barrier was only "satisfactory." Id. at 25.

On the other hand, Couture contends that the seepage or leakage was indeed "unknown" to him because he believed all of the issues to be resolved. Returning to the two "categories" of damages and their attendant repairs, the Second Inspection Report indicates that the shut-off valve was replaced and a vapor barrier was installed. UPC argues that Couture nevertheless knew that the damages existed and should have known that a third inspection was necessary. But as the court has discussed, the depositions do not conclusively demonstrate that Couture was aware that the same damage was described in both the inspection reports and Howell's report, and it is a triable fact as to whether he subjectively believed the repairs resolved the issues such that any future leakages were "unknown."

The same is true for the subflooring issues. As discussed above, the court is unable to discount the CL-100 letter as evidence of a second repair, though it is likewise unable to discount UPC's contention that Couture did not receive the letter prior to

applying for the Policy.  UPC also claims that the damages discovered by Couture were

the result of months of deterioration.  The court finds it unlikely that Couture, a first-time

homeowner, would have completed the process of purchasing the Residence if he had any

indication that there were lingering issues.  Couture then proceeded to live at the

Residence for approximately four months before he identified the damages.  For the court

to adopt UPC's argument, it would have to find that Couture knowing endured the

damages for months before finally filing his claim.  At minimum, the extent of Couture's

knowledge of the impairments in his home is a triable issue.  For the same reasons

discussed earlier, the court is unable to find as a matter of law that the Policy was

invalidated on the grounds that the damage was known to Couture as the insured.

### 3.  "Deterioration" and "Faulty, Inadequate, or Defective" "Workmanship or Repair"

UPC next argues that the Policy does not cover loss resulting from "deterioration"

or "faulty, inadequate or defective workmanship or repair."  ECF No. 90 at 27.

Specifically, subsection A.2.c.(6)(a) under the section on "Exclusions" provides that UPC

does not insure for loss caused by "any of the following," including "wear and tear,

marring, [and] deterioration."  ECF No. 90-8 at 12 (emphasis added).  "Deterioration" is

not a defined term in the Policy.  Subsection B.3.b. in the same section provides that UPC

does not insure for loss to property caused by "[f]aulty, inadequate or

defective . . . workmanship[ or] repair."  Id. at 15.

"If the contract's language is clear and unambiguous, the language alone,

understood in its plain, ordinary, and popular sense, determines the contract's force and

effect."  Beaufort Cnty. Sch. Dist., 709 S.E.2d at 90.  In the absence of a Policy

definition, UPC attempts to define "deterioration" as "the process of becoming worse."

ECF No. 90 at 27 (citing Cambridge Dictionary Online definition of "deterioration"). But as discussed earlier, the terms of the contract plainly provide that UPC would cover "seepage or leakage of water"—including condensation "over a period of weeks, months or years"—so long as it was "unknown to all 'insureds'" and "hidden within the walls or ceilings or beneath the floors." ECF No. 90-8 at 29 (Endorsement HO 04 27 04 02). It would therefore be a self-contradictory and anomalous result if such damages could constitute deterioration as well. Moreover, the Policy is governed by contract law, and courts analyzing South Carolina common law have determined that such damages are not typically excluded from similar coverage-exclusion provisions. See, e.g., Lawson v. Nationwide Mut. Fire Ins. Co., 2010 WL 1791283, at *2 (D.S.C. May 3, 2010) (holding that the enforceability of a policy exclusion for "continuous or repeated seepage or leakage . . . and results in deterioration" was "dependent on issues of material fact" because the insured disputed whether the damage was caused by a continuous or sudden leak); but see L.J., Inc. v. Bituminous Fire and Marine Ins. Co., 621 S.E.2d 33, 35–36 (S.C. 2005) (determining road deterioration did not constitute an "occurrence" under a commercial general liability policy because the deterioration was the result of negligent workmanship); but c.f. TRAVCO Ins. Co. v. Ward, 715 F. Supp. 2d 699, 714 (E.D. Va. 2010) ("Most jurisdictions hold that an exclusion for damages caused by corrosion precludes recovery for damages caused by corrosion regardless of what caused the corrosion or how suddenly the corrosion occurred.").

With regard to the faulty workmanship exclusion, Couture argues that its expert testified that such provisions are meant to apply only to damages from the repair itself, and not to ensuing damages. ECF No. 92 at 17 (citing ECF No. 92-3, Weaver Aff. at 7).

Such an interpretation seems at-odds with South Carolina precedent, see L.J., Inc., 621 S.E.2d at 36, but in any event, the court need not determine the proper interpretation of the provision because there has been limited evidence presented of faulty repairs. Although the Second Inspection Report indicated that certain repairs after the First Inspection did not appear to be adequate, UPC points to no evidence indicating that the repairs conducted after the Second Inspection Report and by My Friend The Plumber were faulty or inadequate. UPC appears to be relying on a leap of logic that the damages at issue could only be the result of insufficient repairs, but as discussed, the court is unable to determine as a matter of law that those damages were related.

### 4. "Ensuing Loss"

Next, UPC anticipated that Couture would argue that even if the water damage were not an "occurrence," UPC is still responsible for coverage of an "ensuing loss" if it fell within the policy period, and UPC proceeded to respond accordingly. However, Couture ultimately did not raise this argument in his motion for summary judgment. The court therefore finds that there is no need to address this issue.

### 5. Concealment, Misrepresentation, and Fraud

Finally, the parties dispute whether Couture concealed or misrepresented facts on the Policy application such that UPC no longer owed coverage under the terms of the Policy. Subsection Q of the Policy's "Conditions" states:

> We provide coverage to no 'insureds' under this policy if, whether before or after a loss, an 'insured' has:
>
> 1. Intentionally concealed or misrepresented any material fact or circumstance;
> 2. Engaged in fraudulent conduct; or
> 3. Made false statements;
>
> relating to this insurance.

15

ECF No. 90-8 at 18.  The Policy application contained a question asking "Does the dwelling currently have any unrepaired or existing damage?"  ECF No. 90-7 at 4. Couture replied, "No."

UPC maintains that Couture knew about the subflooring damage and did not disclose it.  But the court has determined that there is a genuine dispute of material fact as to whether Couture knew of any damages related to the subflooring damage and whether he knew, if true, that the subflooring had not been repaired.  As such, there is a similarly a genuine dispute as to whether he truthfully answered that there was no "unrepaired or existing damage" as it related to those issues.

As a separate basis, UPC states that Couture admitted Weese could not and did not address all of the problems identified in the first and second investigation reports, and as such, Couture admitted that he was not truthful on the Policy application.  UPC produced the following deposition exchange:

> Q.      So if all you had at that time was your reinspection report, it would be fair to say that there was unrepaired and existing damage at the house at that time.
> A.      That is correct.
> MR. HAWK: Object to the form.
> BY MS. LaFAVE:
> Q.      And you have testified that you never received any information from an electrician, right?
> A.      Correct.
> MR. HAWK: Object to the form.
> BY MS. LaFAVE:
> Q.      Anyone who is qualified to do structural work.
> THE WITNESS: Object to the form.
> BY MS. LaFAVE:
> Q.      Is that right?  You have to answer my question.
> A.      Correct, yeah.
> Q.      And those things were all included in these inspection reports, were they not?
> A.      Correct.

> Q.      So if the existing damage or the unrepaired items in these inspection reports were still there, your answer to No. 7 is also not true.
> MR. HAWK: Object to the form.
> THE WITNESS: Well, technically if I got this because I can't remember the date and everything is repaired, then technically my answer would be correct.
> BY MS. LaFAVE:
> Q.      Right, but Mr. Weese's letter doesn't address all the things that were in these inspection reports, would you agree with that?
> MR. HAWK: Object to the form.
> THE WITNESS: Yeah, I'd agree.
> BY MS. LaFAVE:
> Q.      So outside of even if you had received Mr. Weese's letter that's marked as Exhibit No. 12, there are still electrical problems and structural problems that Mr. Weese never represented that he fixed.
> MR. HAWK: Object to the form.
> BY MS. LaFAVE:
> Q.      Do you agree with that?
> A.      Correct.
> Q.      Okay. So if that's the case, then your answer to No. 7 would also be untrue.
> MR. HAWK: Object to the form.
> THE WITNESS: Correct.

Couture Dep. at 80:3–82:2.

In other words, even if Couture truthfully stated that there was no unrepaired or existing damage based on his reliance of the CL-100 letter from Weese, Couture knew that Weese did not address the "electrical and structural problems" that were still outstanding as of the Second Inspection Report.  Id. at 81:17–81:18; see also ECF No. 90-4 at 18 ("A qualified electrician should inspect further and repair as needed . . . . The repairs do NOT appear to be adequate."); see id. at 22 ("The repairs do NOT appear to be adequate[:] Insulation is missing at various areas in the crawlspace[].").  As Couture acknowledged, this meant his answer to the question about unrepaired and existing damage on the Policy application was "untrue."  Couture Dep. at 81:24–82:2.  In response, Couture first argues that UPC never mentioned the provision on concealment, misrepresentation, or fraud in any of its denial letters.  In doing so, Couture ignores that

in UPC's notice of cancellation dated April 9, 2019, UPC specifically stated that it was taking the action because of "[m]aterial misrepresentation of fact." ECF No. 90-13 at 3. Second, Couture argues that he never made any false statements regarding the actual claim at hand, which is solely for damages arising out of the leak in the washer supply line. See ECF No. 92 at 18 ("[T]he electrical issues and structural issues cited by UPC have nothing to do with Couture's claim . . . ."). Therefore, the court must confront the issue of whether a misrepresentation of a fact, even a supposedly separate and unrelated one, may ipso facto nullify coverage.

The parties argue that different standards apply. UPC argues that it is not seeking rescission of the Policy and instead, it asserts that subsection Q allows for the "exclusion of coverage" for misrepresentation, concealment, or false statements. ECF No. 93 at 10. In support, UPC cites to Government Employees Insurance Co. v. Chavis, 176 S.E.2d 131 (S.C. 1970). Chavis concerned a declaratory judgment action where the insurer sought to have an automobile liability insurance policy declared void ab initio. As the Supreme Court of South Carolina explained, "Where a fact is specifically inquired about, or a question so framed as to elicit a desired fact, . . . [a]n applicant is required to make full answers without evasion, suppression, misrepresentation or concealment of material facts." Id. at 133–34. This court previously had an occasion to distinguish Chavis in another insurance coverage case. In Ball v. USAA Life Insurance Co., the court held that Chavis should not be broadly read to suggest that "an insurer has an absolute right to rely on answers given in a policy application, such that an insurer can never be estopped from rescinding the policy based on misrepresentations contained in the application." 2017 WL 4119659, at *9 (D.S.C. Sept. 18, 2017). The court determined that Chavis did not

apply to a scenario where the insurer is alleged to have represented to the applicant that it would not fully rely on his answers.  Id. (applying Chavis in a case where the insurer asked the applicant for a HIPPA authorization form even after the applicant completed a medical questionnaire).  Such a scenario does not appear to arise here.  Although Couture claims that UPC told Couture it would send a separate inspector to the residence, such a representation should not have indicated to Couture that UPC would not rely on his answers regarding the state of the residence.  Chavis is therefore applicable.

Conversely, Couture argues that effectuating the relevant provision "would essentially act to allow UPC to rescind," and accordingly, Couture cites to the South Carolina standard for insurance rescission.  See ECF No. 92 at 18 (citing Certain Interested Underwriters at Lloyd's London v. Cooper, 2012 WL 554577, at *6–7 (D.S.C. Feb. 21, 2021)).  For an insurance company to rescind a policy based on fraudulent misrepresentation, the insurer must demonstrate by "clear and convincing evidence: (1) the statement was false; (2) the falsity was made known to the applicant; (3) the statement was material to the risk; (4) the statement was made with the intent to defraud the insurer; and (5) the insurer relied on the statement when issuing the policy." Hoffman v. Kansas City Life Ins. Co., 2019 WL 2297348, at *2 (D.S.C. May 30, 2019) (quoting Primerica Life Ins. Co. v. Ingram, 616 S.E.2d 737, 739 (S.C. Ct. App. 2005)).

Although the parties believe they are arguing different standards, the court finds that these cases are not at odds.  While UPC claims that Chavis stands for the principle that a court may void an insurance policy based on an express provision of the policy, the court in Chavis specifically considered whether the insurer should be estopped from

voiding the policy <u>ab</u> <u>initio</u> and from rescinding the policy.  Accordingly, the court

applied a similar standard:

> The burden was upon the appellant to show not only that the statements
> made by Chavis in his application for insurance were untrue but, in addition
> that their falsity was known to Chavis, that they were material to the risk,
> and relied on by the insurer, and that they were made with the intent to
> mislead and defraud the insurer.

<u>Chavis</u>, 176 S.E.2d at 134.  Thus, despite the aspersions cast by UPC for the rescission

standard—which it argues does not require an intent to defraud—it appears that courts do

not recognize a meaningful distinction, and UPC provides no contrary authority.  Thus,

the court proceeds to analyze each of the four elements for rescission.

Couture disputes that the first and second elements are met here.  Beyond arguing

that the electrical and structural issues discussed in the deposition are irrelevant, Couture

also argues that he did not know that unrepaired electrical and structural issues existed at

the time he signed the application, and he would have indicated otherwise at "his

deposition had the question been asked."  ECF No. 95 at 5.  The court harbors some

doubts as to the veracity of this argument, as Couture appeared to confirm that his

<u>response</u> to question seven was untrue.  <u>See</u> Couture Dep. at 81:24–82:2 ("Q. Okay.  So if

that's the case, then your answer to No. 7 would also be untrue . . . . THE WITNESS:

Correct.").  Nevertheless, the court finds, in the absence of other direct evidence of

misrepresentation, the issue of whether the falsity was made known to Couture is an issue

reserved to the trier of fact.  Therefore, summary judgment is inappropriate.

Couture also argues under the third element that the failure to report the other

issues was immaterial because this claim only concerns damage arising from the leak in

the washer supply line.  The court disagrees on this point.  The issue is whether the

information was material to the insurer in issuing the policy, not whether it was material

20

to the claim at hand.  A misrepresentation is material if a reasonable person would

conclude that it is likely to influence the insurance company's assessment of the risk,

thereby affecting the decision to provide coverage, or the terms on which such coverage

is provided.  S. Farm Bureau Cas. Ins. Co. v. Ausborn, 155 S.E.2d 902, 908 (S.C. 1967)

("A representation is material when the insured knows or has reason to believe that it will

likely affect the decision of the insurance company as to the making of the contract of

insurance or as to its terms.").  It is inconsequential that the claimed damages were

unrelated to the false statement; the question is whether it would have altered UPC's

decision to issue the Policy to Couture if it had known of the electrical wiring damage,

insulation problems, and other issues.  UPC argues that the answer is ostensibly yes.  But

on a motion for summary judgment, the court must be presented with some indicia for

reaching such a conclusion, and UPC has presented no such testimony.  UPC states in its

motion that "[i]f the truth had been disclosed, UPC would not have issued the Policy,"

ECF No. 90 at 31, but ultimately provides no evidentiary support for the assertion.  On

this basis as well, summary judgment is not warranted.

       Finally, under the fourth prong, "the intent with which representations or

misstatements of facts are made is a thing that is locked up in the heart and consciousness

of the applicant.  It may be shown by his express words, or it may be deduced from his

acts and the facts and circumstances surrounding the making of the misrepresentations,

though on this question the mere signing of the application containing the answers

alleged to be false is not conclusive."  Peterson v. First Health Life & Health Ins. Co.,

2010 WL 2723113, at *7 (D.S.C. July 9, 2010) (quoting Johnson v. N.Y. Life Ins. Co.,

164 S.E.2d 175 (S.C. 1932)).  "[O]rdinarily[,] whether a misstatement of fact in the

application was made with the intent to deceive and defraud the insurer is a question for determination by the jury." <u>Arnold v. Life Ins. Co.</u>, 83 S.E.2d 553, 557 (S.C. 1954). "However, where the only reasonable inference warranted by the evidence is that the policy was procured by fraudulent misrepresentations," a court may grant summary judgment. <u>Id.</u>; <u>see also</u> <u>Floyd v. Ohio Gen. Ins. Co.</u>, 701 F. Supp. 1177, 1190 (D.S.C. 1988) ("Under South Carolina law, an intent to deceive may be inferred when there is no other reasonable or plausible explanation for the applicant's false representation."). In this respect, the lack of lip service paid to Couture's motivations hinders his argument. Without any other explanation, the court may conclude that Couture was solely motivated by the intent to obtain insurance even in the face of known damages, which constitutes an intent to defraud. <u>See</u> <u>Chavis</u>, 176 S.E.2d at 133 ("We do not see how any reasonable inference could be drawn from the record, other than it was the intent of Chavis, in making false and untrue answers to the questions asked, to deliberately deceive the appellant and, thereby, procure the liability insurance."). Nevertheless, UPC has failed to establish the other elements by clear and convincing evidence, and this factor alone is not dispositive.

Finally, under the fifth element, the court finds that UPC has provided no clear and convincing evidence to show that it relied on the Couture's statements in the Policy application when issuing the Policy. Therefore, there are genuine disputes of material fact as to whether UPC may rescind the Policy or exclude the damages from coverage on grounds that Couture misrepresented, concealed, or otherwise defrauded UPC.

### B. Couture's Counterclaims

The court next addresses UPC's motion for summary judgment as it relates to Couture's counterclaims. Couture asserts counterclaims for breach of contract, bad faith, and negligence. ECF No. 5. UPC argues that even assuming the coverage is upheld, Couture's counterclaims may be summarily dismissed. The court considers each counterclaim in turn, ultimately finding that summary judgment is warranted as to the bad faith and negligence counterclaims.

#### 1. Breach of Contract

UPC contends that Couture's breach of contract counterclaim may be dismissed because UPC did not breach its contractual obligations under the Policy and Couture himself did not comply with his obligations under the same. In support, UPC argues that an insured's failure to cooperate will release the insurer from liability. ECF No. 90 at 30 (citing Shiftlet v. Allstate Ins. Co., 451 F. Supp. 2d 763, 770 (D.S.C. 2006)).

"[A]n insurer, seeking to relieve itself of liability because of the violation by the insured of a cooperation clause in the policy, has the burden of showing not only that the insured failed to cooperate within the meaning of the policy provision but that it was substantially prejudiced thereby." Vaught v. Nationwide Mut. Ins. Co., 156 S.E.2d 627, 630 (S.C. 1967). "Under the law of South Carolina, the question whether or not the insured has met his obligation to cooperate is ordinarily one to be determined by the trier of the facts." Shiftlet, 451 F. Supp. 2d 763, 770–71 (D.S.C. 2006). Where an insured has failed to cooperate, the question of whether the failure to cooperate caused prejudice to the insurer is also generally a question of fact for the jury. See Puckett v. State Farm Gen. Ins. Co., 444 S.E.2d 523, 524 (S.C. 1994) ("Whether Insurer suffered prejudice

23

from [the insured's] alleged failure to cooperate is an issue to be determined by the trier

of fact on the merits of the action"); Vaught, 156 S.E.2d at 630 (holding that the question

of whether an insurer suffered prejudice from the insured's failure to cooperate "is

generally one of fact for the jury and becomes one of law for the court only where there

can be but one reasonable inference from the evidence").

UPC argues that "Couture's failure to provide truthful information both at the

inception of the Policy and at the inception of the claim prejudiced UPC's investigation

of the claim."  ECF No. 90 at 31.  Specifically, UPC points to Couture's failure to

document evidence of the prior damages before they were purportedly fixed.  For reasons

stated in the court's discussion on the declaratory judgment action, there are unsettled

questions as to whether Couture failed to provide proper notice based on his subjective

knowledge, as required under the Policy.  The court finds that there is also a lack of direct

evidence as to whether Couture's supposed failure to cooperate substantially prejudiced

UPC.  As just one example, Couture has presented a factual dispute over whether UPC, at

the inception of the claim, was capable of discovering all of the defects through its own

investigator but simply refused to do so.  Ultimately, these are questions best left to the

trier of fact.  Therefore, the court denies UPC's motion for summary judgment as it

pertains to Couture's breach of contract counterclaim.

### 2.  Bad Faith

The elements of bad faith refusal to pay are: "(1) the existence of a mutually

binding contract of insurance between the plaintiff and the defendant; (2) refusal by the

insurer to pay benefits due under the contract; (3) resulting from the insurer's bad faith or

unreasonable action in breach of an implied covenant of good faith and fair dealing

arising on the contract; (4) causing damage to the insured." <u>Crossley v. State Farm Bureau Cas. Ins. Co.</u>, 415 S.E.2d 393, 396–97 (S.C. 1992) (citation omitted). "If there is a reasonable ground for contesting a claim, there is no bad faith." <u>Id.</u> at 397. Courts have further specified that an insurer has on objectively reasonable ground when that insurer "clearly did not improperly contest coverage, nor did [it] act in willful, wanton, or reckless disregard of [the insured's] rights under the Policy." <u>Shiftlet</u>, 451 F. Supp. 2d at 772. "When conflicting evidence is presented, summary judgment on the issue of bad faith is generally inappropriate; however, a court may grant summary judgment on this issue if, viewing the evidence in the light most favorable to the plaintiff, no reasonable finder of fact could have found for the plaintiff on her bad faith claim." <u>Id.</u> (citation omitted).

The court finds, as a matter of law, that UPC did not act unreasonably in denying Couture's claim based on the evidence of preexisting damage found in the inspection reports, the photographs taken by Howell, and the proximity of those respective damages in both time and location. Although the evidence is not sufficient to determine as matter of law that the losses were preexisting such that the Policy is void, a reasonable juror could not find that UPC's adjusters acted in bad faith when it denied Couture's claim when faced with such extensive evidence of preexisting damage. UPC has presented sufficient evidence indicating that UPC's denial was not motivated by ill will, including its adjuster's consideration of inspection reports where a third-party company documented damages that were determined to have existed prior to Couture's submission of his policy application. Chery also requested other itemized documents and photographs from Couture, and although Couture argues it had no duty under the law to

supply such items, such a failure can be evidence that UPC's declination was warranted.

UPC has indicated that all this information was before Chery at the time the decision was

made and not derived after the denial, see ECF No. 90 at 17, and Couture has not shown

any evidence to the contrary. Therefore, the court grants UPC's motion for summary

judgment and dismisses Couture's bad faith counterclaim.

### 3. Negligence

The complaint alleges the following grounds for asserting negligence per se:

a. Failing to adopt, develop and implement reasonable standards for the prompt and adequate investigation of Defendant's claims arising under the Policy;
b. Not attempting in good faith to effect a prompt, fair and equitable settlement of Defendant's claims arising under the Policy;
c. Unreasonably denying and failing to properly investigate, adjust and process Defendant's claims for covered losses under the Policy;
d. Compelling Defendant to institute suit to recover amounts reasonably due or payable with respect to claims under the Policy;
e. Knowingly misrepresenting to Defendant policy provisions relating to coverages at issue;
f. In such other and further particulars in violation of S.C. Code Ann. §[]38-59-20, et seq. as may be ascertained during the course of discovery or trial of this case.

ECF No. 5, Ans. ¶ 60. The complaint further alleges that UPC was negligent in four

ways:

a. In failing to timely and properly adjust, investigate and approve Defendant's claim arising under the Policy;
b. In failing to adopt and implement reasonable standards for the prompt and adequate investigation and settlement of Defendant's claims;
c. Unreasonably denying coverage for Defendant's claims;
d. In failing to exercise the degree of care which a reasonably prudent company would have exercised under the same circumstances;
e. In such other and further particulars as may be ascertained during the course of discovery or trial of this case.

Id. ¶ 65.

To prevail in a negligence action, a plaintiff must demonstrate that "(1) defendant owes a duty of care to the plaintiff; (2) defendant breached the duty by a negligent act or omission; (3) defendant's breach was the actual or proximate cause of the plaintiff's injury; and (4) plaintiff suffered an injury or damages." Doe v. Marion, 645 S.E.2d 245, 250 (S.C. 2007). The existence and scope of the duty are questions of law for the courts. Miller v. City of Camden, 451 S.E.2d 401, 403 (S.C. Ct. App. 1994), aff'd as modified, 494 S.E.2d 813 (S.C. 1997); Roe v. Bibby, 763 S.E.2d 645, 648 (S.C. Ct. App. 2014). "If there is no duty, then the defendant in a negligence action is entitled to summary judgment as a matter of law." Hurst v. E. Coast Hockey League, Inc., 637 S.E.2d 560, 562 (S.C. 2006); see also Hopson v. Clary, 468 S.E.2d 305, 307 (S.C. Ct. App. 1996) ("If the evidence as a whole is susceptible to only one reasonable inference, no jury issue is created and [summary judgment] is properly granted.").

UPC first argues that it "did not breach its duty to Couture simply because it denied coverage for a loss." ECF No. 90 at 35. The court agrees with UPC that Couture's negligence claims related to UPC's alleged failures in applying investigative standards and in denying Couture's claims are not proper grounds for a negligence action. Courts in South Carolina have dismissed negligence claims against insurers that are based solely on an insurer's failure to perform under an insurance policy. See Felder v. Great Am. Ins. Co., 260 F. Supp. 575, 578-79 (D.S.C. 1966) (determining that no duty was imposed upon the insurer under principle that a duty must arise out of a relationship created apart from the contract); Brown v. S.C. Ins. Co., 324 S.E.2d 641, 645 (S.C. Ct. App. 1984), overruled on other grounds by Charleston Cnty. Sch. Dist. v. State Budget & Control Bd., 437 S.E.2d 6, 9 (S.C. 1993) (finding that an allegation of negligence related

to the insurer's obligations under the policy, "standing alone[,] is not an independent source of liability"). As such, Couture cannot succeed on his negligence claims based on UPC's failures to apply reasonable standards in deciding his insurance claim and its negligence in denying the claim because those allegations are premised on UPC's failure to perform under the Policy.

Likewise, the court finds Couture's allegation that UPC negligently compelled Couture to institute a suit and knowingly misrepresented the Policy's provisions to Couture to be legally deficient. UPC argues in its motion that it could not have compelled Couture to institute a lawsuit because this action arose on UPC's declaratory judgment action. UPC further argues that there is no evidence that UPC knowingly misrepresented any Policy provisions to Couture and if there were, they would have been revealed already. UPC argues that the closest Couture comes to presenting evidence of a misrepresentation is through its claim that Couture had to wait hours on the phone before his call was returned by Chery. Couture fails to specifically respond to these arguments. Even if the court were to view the facts favorably for Couture, the court can identify no supporting authority for finding that compelling another to sue gives rise to a valid negligence claim, and accordingly, the court grants summary judgment in UPC's favor as it relates to these claims.

Finally, Couture's complaint alleges, at various points, that UPC failed to reasonably investigate Couture's claims. Under South Carolina law, an insurer has a "good faith duty to investigate a claim." Flynn v. Nationwide Mut. Ins. Co., 315 S.E.2d 817, 820 (S.C. Ct. App. 1984). On this point, UPC argues that it "promptly and adequately investigated Couture's claims." ECF No. 90 at 35. Neither party disputes

that after the claim was filed, UPC sent both a contractor to observe water mitigation efforts and Worley to inspect the Residence.  In his response, Couture fails to rebut this evidence or otherwise argue how UPC was negligent in its post-claim investigation. Instead, Couture argues that UPC failed "to investigate the Residence at the time of the policy inception."  ECF No. 92 at 21.  Couture appears to be referring to his argument that in evaluating Couture's application, "UPC explicitly indicated to Couture that UPC would be performing its own inspection of the Residence '[t]o make certain that the homes [UPC] insures meet our underwriting guidelines.'"  ECF No. 92 at 8 (quoting ECF No. 92-2).  According to Couture, UPC never produced an inspection report indicating that an inspection had been performed.  Couture raises this fact as a basis for its negligence claim for the first time here.  Its complaint plainly alleges that UPC was negligent in failing to investigate "Defendant's claim arising under the Policy."  See, e.g., Ans. ¶ 65(a) (emphasis added).  In the absence of any argument or evidence to the contrary, the court finds as a matter of law that UPC did not negligently investigate Couture's claims arising under the Policy and grants summary judgment in UPC's favor as it relates to the same.  While the court is inclined to find that Couture's argument— that UPC was negligent in failing to investigate the Residence prior to the inception of the Policy—is completely new, it recognizes that the complaint left room for additional factual allegations of negligence, see Ans. ¶¶ 60(f), 65(d), and UPC did not reply on the issue.  There is a genuine issue of material fact as to whether UPC failed to investigate the Residence prior to issuing the Policy in accordance with its own standards and whether it was negligent in doing so.  Therefore, the court declines to grant summary judgment in UPC's favor on Couture's negligence claims solely as they relate to UPC's

purported failure to reasonably investigate the Residence before the inception of the Policy.  In all other respects, the court grants summary judgment on Couture's negligence and gross negligence claims in UPC's favor.

### IV.   CONCLUSION

For the reasons set forth above, the court **GRANTS IN PART** and **DENIES IN PART** UPC's motion for summary judgment and **DENIES** Couture's motion for summary judgment.

**AND IT IS SO ORDERED.**

**DAVID C. NORTON**
**UNITED STATES DISTRICT JUDGE**

**March 3, 2022**
**Charleston, South Carolina**

30