**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**CHARLESTON DIVISION**

| | | |
|---|---|---|
| UNITED PROPERTY & CASUALTY INSURANCE, | ) ) ) | |
| Plaintiff, | ) ) | No. 2:19-cv-01856-DCN |
| vs. | ) ) | **ORDER** |
| ALLEN P. COUTURE, | ) ) | |
| Defendant. | ) ) | |
| _____ | ) | |

    This matter is before the court on four pending motions: (1) plaintiff United Property & Casualty Insurance's ("UPC") motion in limine to exclude the testimony of Lauraleigh Weaver, ECF No. 132 (the "first <u>Daubert</u> motion"); (2) UPC's motion in limine to exclude the testimonies of Darren Nimchuk and Michael Hewitt, ECF No. 133 (the "second <u>Daubert</u> motion"); (3) defendant Allen P. Couture's ("Couture") motions in limine, ECF No. 134; and (4) UPC's motions in limine, ECF No. 138.  For the reasons set forth below, the court (1) denies UPC's first <u>Daubert</u> motion, (2) grants in part and denies in part UPC's second <u>Daubert</u> motion, (3) grants in part and denies in part Couture's motions in limine, and (4) grants in part and denies in part UPC's motions in limine.

**I.   BACKGROUND**

    This insurance dispute arises out of a homeowner's insurance policy (the "Policy") between an insurer, UPC, and its former insured, Couture, covering Couture's primary residence located at 1344 Winterberry Avenue, Goose Creek, South Carolina (the "Residence").  Prior to purchasing the Residence, Couture had an inspection performed on August 29, 2018 that unearthed several issues, including damage to the

subflooring in multiple locations and faulty shut-off valves that caused the plumbing underneath the laundry room and kitchen to leak (the "First Inspection Report").  ECF No. 90-2.  After the seller of the Residence (the "Seller") purported to fix those issues, Couture had a second inspection performed on September 21, 2018.  The second inspection found all repairs to the "Plumbing System," including to the shut-off valves, to be "satisfactory"; however, it also noted that certain repairs to the subflooring in the master bathroom and kitchen "d[id] NOT appear to be adequate" because the subflooring remained "deteriorated" (the "Second Inspection Report").  ECF No. 90-4 at 12, 14 (emphasis in original).  The Seller subsequently agreed to hire a contractor to make all the outstanding repairs.  ECF No. 91-2, Couture Aff. ¶¶ 10–11.  The contractor completed these repairs, and on October 3, 2018, wrote a letter to the Seller summarizing the repairs that were done.  On October 5, 2018, Couture filed an application for a homeowner's insurance policy with UPC.  ECF No. 90-7.  The application included a question asking if the Residence had any "unrepaired or existing damage," to which Couture responded, "No."  Id. at 4.  UPC granted the application and issued the Policy to Couture with the policy period beginning on October 15, 2018 and continuing through October 15, 2019.  ECF No. 90-8.

On March 17, 2019, Couture became aware of a leak in the laundry room's water supply line that caused significant water damage to the subflooring and walls of the laundry room and caused the kitchen cabinets to become "warped and swollen."  Couture Aff. ¶ 15.  As a result, Couture filed a claim under the Policy.  On March 22, 2019, UPC sent Michael Howell ("Howell"), a third-party field adjuster, to perform a field inspection of the Residence.  After receiving the inspection report from Howell, UPC denied

Couture's claim by letter dated April 4, 2019, reasoning that the claimed damages "appear as a result of long-term water and mold damage prior to your policy inception date, and are considered pre-existing damages prior to the policy term." ECF No. 90-11 at 2. On April 9, 2019, UPC sent Couture a second letter cancelling the Policy due to a material misrepresentation of fact, based on Couture's answer on the Policy application that the Residence was free of "unrepaired or existing damage." ECF No. 90-13 at 3. On May 2, 2019, UPC sent Couture a third letter regarding its denial of the claim. ECF No. 90-15.

On June 28, 2019, UPC filed a declaratory judgment action, asking the court to declare that Couture is not entitled to coverage under the Policy for claimed damages to the Residence. ECF No. 1, Compl. On August 8, 2019, Couture answered the complaint and asserted counterclaims for breach of contract, bad faith, and negligence/negligence per se. ECF No. 5. On March 3, 2022, the court entered an order on the parties' respective motions for summary judgment, ECF No. 101, and on June 8, 2022, the court entered an order partially granting Couture's motion for reconsideration. As a result of the court's orders, the following claims remain at issue: (1) UPC's declaratory judgment action, (2) Couture's counterclaim for breach of contract, and (3) Couture's counterclaim for negligence as to UPC's alleged failure to reasonably investigate the Residence.

On October 17, 2022, UPC filed a motion to exclude the testimony of Lauraleigh Weaver. ECF No. 132. On the same day, UPC filed a motion to exclude the testimonies of Darren Nimchuk and Michael Hewitt, as well as evidence of Hewitt Residential Construction's repair proposals. ECF No. 133. Couture responded to both motions on October 31, 2022, ECF No. 145, and UPC replied in support of both motions on

November 4, 2022, ECF No. 152.  On October 17, 2022, Couture filed his motions in limine.  ECF No. 134.  UPC responded in opposition on October 31, 2022.  ECF No. 146. Couture did not file a reply and the time to do so has now elapsed.  On October 17, 2022, UPC filed its motions in limine, ECF No. 135, which it amended on October 18, 2022, ECF No. 138.  Couture responded to the amended motions on October 31, 2022.  ECF No. 147.  UPC did not file a reply and the time to do so has now elapsed.  The court held a hearing on the motions on November 7, 2022.  ECF No. 156.  As such, all motions have been fully briefed and are now ripe for review.

## II.  DISCUSSION

The court addresses the motions in the order that they were filed.[1]  As a preliminary matter, Couture argues that UPC's first and second motions, which were brought under Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579 (1993), should be denied as untimely.  Under the eighth amended scheduling order, the deadline for dispositive motions in this case was on November 15, 2021.  ECF No. 87.  The parties dispute whether a motion brought under Daubert should be considered a dispositive motion or a motion in limine.  UPC argues that its Daubert motions should not be considered dispositive motions and are thus timely.  Couture claims that the original scheduling order established that Daubert motions fall under the category of dispositive motions.  The first and second amended scheduling orders stated, "Dispositive Motions: All dispositive motions and all Daubert motions shall be filed on or before . . . ."  ECF Nos. 15, 18.  According to Couture, the parties omitted the description of "dispositive

_____

[1] Should the parties believe that additional limiting instructions are necessary based on the court's rulings on these motions in limine, the parties are directed to email the court with their proposed limiting instructions.

motions" in subsequent scheduling orders but retained the same understanding of the meaning.

Had the parties explicitly specified that the deadline for <u>Daubert</u> motions was the same as the deadline for dispositive motions, the court would have ample reason to deny the motions. <u>See</u> <u>Bryant v. Trexler Trucking, Inc.</u>, 2013 WL 643768, at *5 (D.S.C. Feb. 21, 2013) (denying the defendant's <u>Daubert</u> motion, even though it was "couched as a motion in limine," because it was filed months after the deadline to file a <u>Daubert</u> motion). But there is no evidence to suggest that the parties intended to keep the deadline for <u>Daubert</u> motions the same as the deadline for dispositive motions. The remaining scheduling orders do not specifically mention <u>Daubert</u> motions. <u>E.g.</u>, ECF No. 87. As such, the court turns to the merits of the motions.

### A. UPC's First <u>Daubert</u> Motion

UPC's first <u>Daubert</u> motion requests the court exclude the testimony of Lauraleigh Weaver ("Weaver"). Couture proffered Weaver as an expert in claims processing and claims adjusting. ECF No. 145 at 6. According to her report, Weaver was retained to provide an opinion on UPC's conduct in connection with its issuance of the Policy and handling of Couture's claim. ECF No. 132-1 at 3.

Federal Rule of Evidence 702 provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

The proponent of an expert witness's testimony bears the burden of proving that such testimony meets the requirements of Rule 702 by a preponderance of evidence. Daubert, 509 U.S. at 592 n.10.  District courts serve as gatekeepers for expert testimony and carry a "special obligation" to ensure that expert testimony is reliable and relevant. Kumho Tire Co. v. Carmichael, 526 U.S. 137, 147 (1999).  Under Daubert, the court's gatekeeping role requires that it address two questions: first, whether the expert's testimony is based on "scientific knowledge"; and second, whether the testimony "will assist the trier of fact to understand or determine a fact in issue."  509 U.S. at 592.  The first question is answered by assessing "whether the reasoning or methodology underlying the testimony is scientifically valid."  Id. at 592–93.  The second inquiry "goes primarily to relevance."  Id. at 591.  Relevance is determined by ascertaining whether the testimony is sufficiently tied to the facts of the case such that it will aid the jury in resolving a factual dispute.  Id. at 593.  "A review of the caselaw after Daubert shows that the rejection of expert testimony is the exception rather than the rule."  Fed. R. Evid. 702, Advisory Committee's Note to 2000 Amendments.  "Daubert did not work a 'seachange over federal evidence law,' and 'the trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system.'"  Id. (quoting United States v. 14.38 Acres of Land Situated in Leflore Cnty., 80 F.3d 1074, 1078 (5th Cir. 1996)).

UPC argues that Weaver's testimony should be excluded at trial for two reasons: (1) Weaver is not qualified by education or experience, and (2) Weaver's opinions are neither relevant nor reliable.  At the hearing, the court orally denied UPC's motion,

finding that Weaver has the necessary qualifications and that her opinion is relevant. The court further explains each finding below.

### 1. Qualifications

Before a witness may be permitted to provide expert testimony, she must be qualified as an expert. Barnthouse v. Wild Dunes Resort, L.L.C., 2010 WL 3169358, at *3 (D.S.C. Aug. 5, 2010) (citing Thompson v. Queen City, Inc., 2002 WL 32345733, at *1 (D.S.C. July 9, 2002)). When determining if an expert's qualifications are sufficient under Daubert, the court should "'consider the proposed expert's full range of experience and training,' not just h[er] professional qualifications." Belk, Inc. v. Meyer Corp., 679 F.3d 146, 162 (4th Cir. 2012) (quoting United States v. Pansier, 576 F.3d 726, 737 (7th Cir. 2009)). "Generally, the test for exclusion is a strict one," and "[o]ne knowledgeable about a particular subject need not be precisely informed about all details of the issues raised in order to offer an opinion." Thomas J. Kline, Inc. v. Lorillard, Inc., 878 F.2d 791, 799 (4th Cir. 1989) (citing Martin v. Fleissner GMBH, 741 F.2d 61, 64 (4th Cir. 1984)).

Courts have generally found experts to lack the requisite qualifications only when the proposed expert clearly has no relevant qualifications. See id. (determining proposed expert for credit and price discrimination case was not qualified because she was not an economist, had published nothing about price discrimination, credit, or antitrust, worked primarily on analyzing companies' financial health, and had no personal experience making credit decisions); Zellers v. NexTech Ne., LLC, 533 F. App'x 192, 197 (4th Cir. 2013) (determining that a proposed expert seeking to testify that the cause of plaintiff's medical symptoms was exposure to toxic gas was not qualified because she was a

neurologist with no training in the field of toxicology and her knowledge of gas toxicity came from articles downloaded from the internet).

UPC contends that Weaver lacks the qualifications necessary to pass muster under Rule 702 because Weaver has never been retained as an expert or been qualified as an expert in any court. ECF No. 132 at 7 (citing ECF No. 132-2, Weaver Dep. at 9:19–10:2). UPC also argues that Weaver has never been published on any topic in a peer-reviewed journal. Id. (citing Weaver Dep. at 53:10–23). These factors alone, however, are not enough to invalidate Weaver's qualifications. "Even when an expert has never previously been qualified, 'it is the quality' of the expert's qualifications that a district court must focus on." United States v. Young, 916 F.3d 368, 380 (4th Cir. 2019) (quoting United States v. Garcia, 752 F.3d 382, 391 (4th Cir. 2014)) (emphasis in original). "And although publishing in a peer-reviewed publication is often a hallmark of expert witness reliability, that hallmark is a guidepost, not a mandatory prerequisite to qualification as an expert." Id. (citing Nease v. Ford Motor Co., 848 F.3d 219, 229 (4th Cir. 2017)). Thus, the lack of prior expert designations or publications does not automatically disqualify Weaver from qualification as an expert in this case.

UPC further argues that Weaver has limited claims-handling experience. Specifically, UPC notes that Weaver has only been a licensed insurance adjuster for approximately six years, and during that time, she largely worked as a "low-level insurance adjuster." ECF No. 132 at 8–9. For example, UPC takes issue with Weaver's estimation that she made the coverage decision in approximately fifty to sixty percent of the total water damage claims that she handled. Id. at 8 (citing Weaver Dep. at 39:10–40:19). UPC also notes that Weaver did not hold a managerial or supervisory position

until she began working as a general adjuster with Vault Insurance in June 2020. Id. (citing Weaver Dep. at 35:21–25).

"The qualifications of a witness to render an expert opinion are 'liberally judged by Rule 702.'" Ravenell ex rel. Ravenell v. Pugmill Sys., Inc., 2014 WL 7146848, at *4 (D.S.C. Dec. 15, 2014) (quoting Kopf v. Skyrm, 993 F.2d 374, 377 (4th Cir. 1993)). Federal Rule of Evidence 702 recognizes five bases for qualifying as an expert: "knowledge, skill, experience, training, or education." "It is well-settled that an expert can satisfy Rule 702's requirement by meeting any one of the five bases for qualification." See Kopf, 993 F.2d at 377 ("Inasmuch as the rule uses the disjunctive, a person may qualify to render expert testimony in any one of the five ways listed."). Here, what Weaver may lack in education and training, she possesses in knowledge, skill, and experience. Weaver has worked as an independent adjuster who was contracted out to large commercial carriers like State Farm, as a staff adjuster for commercial carriers like Nationwide, and as an independent consultant for her own firm. Weaver Dep. at 27:3– 25, 35:19–25. Claims handling is a technical subject matter, and Weaver's practical experience is a viable substitute for a lack of scientific research or publication. Weaver's report largely draws upon her experience as a claims adjuster. To the extent Weaver testifies on matters that UPC believes are beyond her purview, UPC is free to cross examine Weaver on the limits of her qualifications. The court finds that Weaver is qualified as an expert in claims processing and claims adjusting.

### 2. Relevance and Reliability

UPC argues that even if Weaver were qualified, her expert testimony would not be helpful to the trier of fact. Weaver's report discusses seven ways in which UPC

"acted in bad faith . . . by engaging in conduct that was contrary to industry standards and principles." ECF No. 132-1 at 7. At the hearing, Couture clarified that in lieu of the seven examples of bad faith enumerated in the report, Weaver will simply be testifying about insurance underwriting and other industry standards, including those for water restoration claims.[2] Based on Couture's representations, the court finds that Weaver will be permitted to testify on those issues which remain relevant to the declaratory judgment action and the breach of contract and insurer negligence counterclaims.

UPC argues that Weaver's opinions on industry standards are nevertheless excludable because they consist of legal conclusions that would not assist the trier of fact in understanding the evidence. E.g., ECF No. 132 at 17 (citing Advo, Inc. v. Phila. Newspapers, Inc., 51 F.3d 1191, 1198 (3d Cir. 1995)). "[O]pinion testimony that states a legal standard or draws a legal conclusion by applying law to the facts is generally inadmissible." United States v. McIver, 470 F.3d 550, 562 (4th Cir. 2006). But it is equally well-established that "in certain circumstances, such as cases involving specialized industries, 'opinion testimony that arguably states a legal conclusion is helpful to the jury, and thus, admissible.'" Id. at 562 n.13. Accordingly, courts have permitted experts in the insurance industry to provide testimony that "touch[es] upon legal conclusions." Merrill v. McCarthy, 2016 WL 1258472, at *3 (E.D.N.C. Mar. 30, 2016) (citing Peckham v. Cont'l Cas. Ins. Co., 895 F.2d 830, 837–38 (1st Cir. 1990)).

---

[2] The court previously granted summary judgment in UPC's favor on Couture's counterclaim for bad faith failure to pay. Couture stated at the hearing that Weaver will not be testifying about bad faith, and the court considers the issue resolved as it relates to those opinions.

To balance these competing principles, the court will allow Weaver to testify about "insurance industry standards and general examples of practices in conformance with industry custom." Bullock v. Nat'l Union Fire Ins. Co. of Pittsburgh, 2004 WL 5504973, at *1 (D.S.C. Dec. 9, 2004). However, Weaver "may not testify on [] ultimate legal conclusion[s]," such as whether UPC should have found that there was an occurrence under the terms of the Policy or whether it should have attempted a settlement. Id. (emphasis in original). In sum, Weaver will be permitted to testify as an expert, subject to the limitations set forth above.

**B. UPC's Second <u>Daubert</u> Motion**

UPC filed a second <u>Daubert</u> motion to exclude the testimony of Darren Nimchuk ("Nimchuk") and Michael Hewitt ("Hewitt"), as well as testimony related to the repair proposals generated by Hewitt Residential Construction, LLC ("HRC").

Hewitt is the owner of HRC, and Nimchuk is an employee and agent of the company. Couture designated Nimchuk and Hewitt as experts but stated that they were not "retained or specially employed to provide expert testimony in the case." ECF No. 29 at 1 (citing Fed. R. Civ. P. 26(a)(2)(B)). Nimchuk prepared a handwritten report detailing several proposed repairs to the Residence, dated April 22, 2019 (the "2019 Repair Proposal"). ECF No. 133-1. Nimchuk estimated that the repair proposals would result in a total cost of $44,329.00. Id. On April 12, 2022, Nimchuk prepared an updated version (the "2022 Repair Proposal," and together, the "Repair Proposals"). ECF No. 133-2. The 2022 Repair Proposal is nearly identical to the 2019 Repair Proposal, with two main differences. First, the 2022 Repair Proposal changed an item in the 2019 Repair Proposal from "remove counter tops and reinstall" to "Remove counter tops due

to warping – new may be needed." Id.  Second, it updated the total cost to $55,411.00.

Id.  Though not retained experts, UPC proffered Nimchuk and Hewitt as experts who are

expected to testify about the Repair Proposals and "any other observations made at or

opinions related to the residence, including but not limited to, the scope of repairs needed

at the residence and costs for same."  ECF No. 29 at 1.

Couture agreed at the hearing that he would not call Hewitt as a witness given that

Nimchuk was the only HRC employee to visit the Residence, and Nimchuk alone

prepared the Repair Proposals.  Next, UPC argues that Nimchuk's testimony should be

excluded because Nimchuk did not perform a complete inspection of the Residence to

verify what repairs needed to be performed and because he failed to provide his

underlying facts or data.  The court determined at the hearing that Nimchuk will not be

admitted as an expert witness.  As the Fourth Circuit has explained, "[e]xpert opinion

evidence based on assumptions not supported by the record should be excluded."  Tyger

Constr. Co. Inc. v. Pensacola Constr. Co., 29 F.3d 137, 143 (4th Cir. 1994) (citing E.

Auto Distribs., Inc. v. Peugeot Motors of Am., 795 F.2d 329, 337 (4th Cir. 1986)).

However, the court will permit Couture to call Nimchuk as a lay witness to provide his

personal knowledge about the pricing of the repairs.

UPC argues in its motion that in that scenario, the Repair Proposals would

constitute hearsay.  Specifically, UPC claims that the Repair Proposals are inadmissible

because they lack any indicia of reliability, and as such, they cannot fall under the

business records exception.  But "[r]eports and documents prepared in the ordinary

course of business are generally presumed to be reliable and trustworthy."  Certain

Underwriters at Lloyd's, London v. Sinkovich, 232 F.3d 200, 204–05 (4th Cir. 2000).

12

Courts typically only find that a report lacks reliability where it "is prepared in the anticipation of litigation because the document is not for the systematic conduct and operations of the enterprise but for the primary purpose of litigating." Id. Here, the 2019 Repair Proposal was prepared before litigation was contemplated, as Nimchuk was helping his friend Couture estimate the repair costs. At the hearing, UPC then withdrew its objection to the 2022 Repair Proposal after Couture represented that it was not based on an additional in-home inspection; rather, the update was meant to account for an increase in prices between 2019 and April 12, 2022. See also ECF No. 133-2. Therefore, the court grants in part and denies in part the UPC's second Daubert motion. Nimchuk will not be permitted to testify as an expert but may testify as a lay witness about the Repair Proposals.

### C. Couture's Motion in Limine

Couture sets forth eight motions in limine. At the hearing, the parties agreed to resolve Motion in Limine Nos. 1, 2, and 8, and the court finds those requests moot. The court orally denied Motion in Limine Nos. 3 and 4. The court considers Motion in Limine Nos. 5, 6, and 7 below.

#### 1. Motion in Limine No. 5

In Motion in Limine No. 5, Couture requests the court exclude any reference to any other insurance applications created by Couture other than the application for the Policy in the instant case. Couture argues that any such reference should be excluded under Federal Rules of Evidence 401 and 403. In response, UPC notes that Couture is referring to an application he filed with Southern Fidelity Insurance Company ("Southern Fidelity") dated May 14, 2019. According to UPC, Southern Fidelity's application asked

Couture whether he had any losses during the prior three years (regardless of whether they were paid by an insurer), whether he was aware of existing damages to his residence, and whether he had coverage declined, cancelled, or non-renewed in the prior three years. UPC claims Couture responded "no" to each question, even though he was "unquestionably aware of unrepaired damage." ECF No. 146 at 5. UPC argues that the evidence is relevant because it is circumstantial evidence of a material misrepresentation. Id. (citing Johnson v. N.Y. Life Ins. Co., 164 S.E. 175, 177 (S.C. 1932)). Additionally, UPC argues that the evidence is admissible character evidence under Federal Rule of Evidence 404(b)(2).

The court denies the motion in limine to exclude the evidence. Certainly, whether Couture made a false statement on his UPC insurance application is a disputed factual issue in this case. However, Couture signed the Southern Fidelity application after UPC denied his claim. The jury could reasonably conclude that Couture was not truthful in this application. In this case, UPC is alleging that Couture intentionally misrepresented his knowledge of preexisting damages in the Residence—a very similar set of circumstances that UPC alleges occurred when he applied for insurance with Southern Fidelity. Thus, whether Couture made a false representation in another insurance application would make a fact of consequence in this case more or less likely, and the evidence is therefore relevant.

To be sure, Federal Rule of Evidence 404(b) prohibits propensity evidence, or evidence that a person "acted in accordance with the character" as shown through a prior crime, wrong, or other bad act. Fed. R. Evid. 404(b)(1). But the court agrees with UPC that the evidence is admissible for another purpose, such as to show an absence of

14

mistake or lack of accident.  See Fed. R. Evid. 404(b)(2).  Other courts have allowed

evidence of "subsequent acts to be admitted under Rule 404(b) when they are relevant to

the issue for which they are offered."  See United States v. Elliott, 968 F.2d 1212 (4th

Cir. 1992) (unpublished table opinion) (holding that the district court did not abuse its

discretion in allowing evidence that the defendant misrepresented her citizenship status in

1989 as probative for whether she made a false statement in 1986).  Thus, evidence of

Couture's misstatement is contemplated under the rule's permitted uses.

    In reply, Couture argues that the Southern Fidelity application is not relevant

because it was created under an entirely different set of circumstances.  Couture claims

that unlike here, he did not create the responses to the Southern Fidelity application

questions; rather, a representative created them, and he merely provided his electronic

signature.  Regardless of whether this is true, this argument goes to the weight that the

jury should afford the testimony, rather than its admissibility.  Couture will be allowed to

present evidence regarding the different circumstances at trial, but for the reasons stated

above, the court denies the motion.

### 2.  Motion in Limine No. 6

    Couture's sixth motion in limine requests that the court exclude any letters or

correspondence sent from Couture's counsel.  Couture claims that since Couture's

counsel is not a witness, such evidence would be inadmissible under Federal Rules of

Evidence 401 and 403.  UPC states that there are two categories that these

correspondences fall under.  First, Couture's counsel wrote to UPC asking for it to

reconsider its denial of coverage in 2019.  Second, Couture's counsel supposedly wrote a

letter to Terry Weese ("Weese") and George Newsom ("Newsom"), accusing them of

responsibility for defective repair work.  UPC argues that both categories of communications are permitted under Rule 801(d)(2)(C) as they are an opposing party's statements made by a person—Couture's counsel—whom Couture authorized to make a statement.

> In determining whether an attorney's statements may be admitted as admissions against a party-opponent under Rule 801(d)(2)(C)[,] the Court must determine [(1)] whether the attorney had the authority to act as the party's agent, and (2) whether the statements were made on the subject which the attorney had authority to speak about.

Nationwide Mut. Fire Ins. Co. v. Waddell, 2006 WL 8446055, at *4 (M.D. Ga. Aug. 24, 2006) (citing Coughlin v. Capitol Cement Co., 571 F.2d 290, 306 (5th Cir. 1978)).  Here, Couture's counsel represented Couture at all relevant times, meaning he had authority to act as Couture's agent.  Additionally, both categories of communications were on subjects that defense counsel had authority to speak on.

As for relevance, UPC argues that the first category of communications explains why UPC issued multiple declination letters and demonstrates Couture's failure to cooperate with UPC.  The court agrees that Couture's communications are relevant for those purposes.  With respect to the second category, UPC argues that the letters to Weese and Newsom show that Couture understood that the damage to the Residence was a result of faulty repairs.

By way of background, Weese is a contractor who was hired by Newsom, the Seller, to repair the damages found in the First Inspection Report.  Couture claimed to have learned through his agent that Weese completed the repairs, which, according to Couture, is one reason why he did not indicate that there were preexisting damages on his insurance application.  On March 9, 2022, Couture filed a lawsuit against Newsom and Weese in the Berkeley County Court of Common Pleas (hereinafter, the "State Court

16

Action").  <u>See</u> ECF No. 112-7; <u>Couture v. Newsom</u>, 2022-CP-08-0586 (S.C. Ct. Com. Pl. 2022).  UPC avers that prior to initiating the State Court Action, Couture's counsel wrote a letter to Newsom and Weese "accusing them of responsibility for defective repair work."  ECF No. 146 at 6.  Specifically, defense counsel allegedly wrote, "certain repair work performed prior to my clients [sic] purchase of the Residence was found to be defective, which resulted in . . . damages to non-defective components of the Residence."  <u>Id.</u> at 6–7.  According to UPC, this evidence is relevant to show that Couture understood that defective repair work was the cause of the damages to the house, despite Couture's claims to the contrary in this case.

The admissibility of the letter is closely tied to the admissibility of court filings discussed in the subsequent motion in limine, Motion in Limine No. 7.  Under both motions, Couture argues that the evidence is irrelevant because Couture did not accuse Newsome or Weese of defective repairs to the subflooring of the Residence—only of faulty electrical work.  As the court explains below, however, the complaint in the State Court Action alleges that Weese did not replace the subfloor under the kitchen and master bathroom.  ECF No. 112-7 ¶ 19.  Based on that allegation, the letter is reasonably related to whether Couture believed that there were defective repairs to the subflooring.  The court finds that the letter is relevant and denies the motion in limine.

### 3.  Motion in Limine No. 7

Motion in Limine No. 7 requests that the court exclude any reference to the State Court Action.  The court denies the motion, finding that the complaint from the State Court Action is relevant.  As noted above, the complaint in the State Court Action refers to faulty or defective work done to the subfloor.  <u>See, e.g.</u>, <u>id.</u> ¶ 16 ("[Weese's work]

made the crawl space appear as if it had been significantly modified and repaired. The newly installed insulation covered up the subfloor of the Residence."); id. ¶ 19 ("The subfloor under the kitchen and master bathroom had not been replaced pursuant to the terms of the Repair Addendum and in direct contravention to the explicit statements by Weese. Instead, the subfloor under the kitchen and master bathroom had been covered up with insulation in an effort to conceal Newsom's and Weese's failure to repair this condition").

At the hearing, Couture claimed that while he may have previously alleged that Newsom and Weese covered up the subfloor, that allegation was based on a mistaken belief, and he is in the process of amending his complaint in the State Court Action to focus on defective electrical work. The issue for Couture is that the complaint, as it currently stands, contains a statement from Couture that may be reasonably read as a statement that Couture believed there were unrepaired damages to the subfloor. The court finds that the complaint is therefore relevant but that the scope of this ruling should be limited. The majority of courts find that while pleadings in a state court case are generally admissible, they may not be considered judicial admissions and thus are "not binding or conclusive."[3] Enquip, Inc. v. Smith-McDonald Corp., 655 F.2d 115, 118 (7th Cir. 1981) (collecting cases); see also Trexlar v. Seaboard Sys. R.R., Inc., 641 F. Supp. 688, 689 (W.D.N.C. 1986) (noting that generally, "a pleading from a related action is

---

[3] UPC argues that Couture's statements in the State Court Action are judicial admissions. But the cases cited by UPC refer to the admissibility of judicial admissions—i.e., "formal concessions in the pleadings, or stipulations by a party"—from the very same case. E.g., Keller v. United States, 58 F.3d 1194, 1198 n.8 (7th Cir. 1995). UPC cites no authority stating that pleadings from a parallel state court case may be treated as binding statements.

admissible as an admission and is evidence of the facts asserted therein").  As such, the court will admit the evidence with an instruction to the jury that any statements are not binding or conclusive upon Couture.[4]  In sum, the court denies Couture's fifth, sixth, and seventh motions in limine.

### D.  UPC's Motions in Limine

UPC presents an additional thirteen motions in limine.  At the hearing, the court orally resolved Motion in Limine Nos. 1,[5] 2,[6] 5, 9, and 11.[7]  Motion in Limine Nos. 3, 4, 7, 8, 10, and 12 were either withdrawn by UPC or had already been resolved by the court under the previous motions.  The court discusses the remaining motions in limine.

---

[4] As for Couture's argument under Rule 403, courts have found that any prejudice that may result from using pleadings from a related action "can easily be cured by [instruction] to the jury regarding the relationship of the state court litigation to this litigation."  Nasios v. Pennwalt Corp., 1990 WL 369572, at *3 (D. Md. Apr. 12, 1990).

[5] Under Motion in Limine No. 1, UPC moves the court to exclude "any disparaging statements about insurance companies designed to invoke the passion or prejudice of the jury."  ECF No. 138 at 1.  At the hearing, the court resolved to consider any such statements as they arose at trial but cautioned counsel for Couture to proceed with care during opening statements in the event that the court later found a fact to be unfairly prejudicial.

[6] Under Motion in Limine No. 2, UPC moves to exclude any argument from Couture "that UPC had a duty to inspect the interior of the residence."  ECF No. 138 at 1.  The court granted the motion on the grounds that the welcome letter that Couture relies upon states that "[t]he inspection is only for the outside of your home."  ECF No. 147-1.  Couture will be permitted to argue that UPC otherwise failed to inspect the Residence after voluntarily undertaking a duty to do so.  See Russell v. Columbia, 406 S.E.2d 338, 339 (S.C. 1991) ("Under common law, even where there is no duty to act but an act is voluntarily undertaken, the actor assumes the duty to use due care.").

[7] Under Motion in Limine No. 11, UPC moves to exclude any evidence of its policies and procedures that (1) were "not in effect on the date in question," and (2) "do not relate to the evidentiary adjustment of claims."  ECF No. 138 at 3.  The court denied the motion to the extent it seeks to preliminarily exclude evidence but stated that UPC could reserve the right to object to the policies or procedures at trial.

### 1.  Motion in Limine No. 6

In Motion in Limine No. 6, UPC moves to admit evidence that Couture sought $75,000 from UPC during the claim stage.  UPC acknowledges that Federal Rule of Evidence 408 prohibits the admission of compromise offers and negotiations, but UPC notes that under Rule 408(b), such evidence may be admitted "for another purpose." Here, UPC argues that the settlement demand is necessary to rebut claims that UPC breached a duty under its insurance contract, as well as to negate allegations that UPC filed the declaratory judgment action "for nefarious reasons."  ECF No. 138 at 2.  The court agrees that the demand is being used for a purpose other than proving the validity or invalidity of either party's claims.  Couture has suggested in prior filings that UPC wrongfully forced him into litigation.  See, e.g., ECF No. 5, Ans. & Countercls. ¶ 60(d). The court finds that to the extent such evidence is presented, the demand for payment is relevant to show why UPC issued multiple declination letters and ultimately brought suit against Couture.  If ultimately offered and admitted, the court will instruct the jury that the monetary demand is not to be taken as evidence of the amount of damages to which Couture is entitled if he succeeds.

### 2.  Motion in Limine No. 13

UPC moves for the sequestration of all witnesses at trial.  Couture objects, "especially as it may be applied to Emily Fonville Couture, Defendant's wife" ("Mrs. Couture").  ECF No. 147 at 6.  Couture argues that Mrs. Couture is a person whose presence is "essential to presenting the party's claim or defense" under Federal Rule of Evidence 615(c).  The court will allow Mrs. Couture to remain in the courtroom. Although Mrs. Couture was not a named insured, she was an insured for most practical

purposes.  Mrs. Couture is married to the named insured to the case, she purportedly

discovered much of the damage to the Residence, and she communicated with UPC about

the insurance application and the Policy.  She is essential and has a direct interest in

Couture's claims and defenses.  As the court explained at the hearing, UPC will similarly

be permitted to have its claims adjuster, Vladimir Chery, remain in the courtroom under

Rule 615(c).  In all other respects, UPC's motion in limine is granted.

### III.   CONCLUSION

For the reasons set forth above, the court **DENIES** UPC's first <u>Daubert</u> motion,

**GRANTS IN PART** and **DENIES IN PART** UPC's second <u>Daubert</u> motion, **GRANTS**

**IN PART** and **DENIES IN PART** Couture's motions in limine, and **GRANTS IN**

**PART** and **DENIES IN PART** UPC's motions in limine, all in accordance with this

order.

**AND IT IS SO ORDERED.**

**DAVID C. NORTON**
**UNITED STATES DISTRICT JUDGE**

**November 8, 2022**
**Charleston, South Carolina**